**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

**UNITED STATES OF AMERICA**,

v.

**KEITH V. BROOKS, et al.**,

Defendants.

Case No. 7:13-CR-15 (HL)

**ORDER**

Before the Court are various motions to suppress evidence and statements filed by Defendants Keith Brooks, Craig Koonce, and Eric Neri. (See Docs. 67, 72, 74, 84, 92, 95, 103, 105).[1] For the following reasons, these motions are denied.

**I.     Findings of Fact**

1. On April 24, 2013, Defendants Craig Koonce, Eric Neri, and Keith Brooks were driving north on Interstate 75 in Lowndes County, Georgia. Koonce was driving the vehicle, while Neri was in the front passenger seat and Brooks was in the backseat. (TM 17, 20).

---

[1] At the evidentiary hearing held on October 1, 2013, the attorneys for the Defendants informed the Court that the following motions had been withdrawn: Defendant Brooks' Motion to Sever Parties (Doc. 77) and his Motion to Dismiss Indictment (Doc. 78); Defendant Koonce's Motion to Suppress Statements (Doc. 85); and Defendant Neri's Motion to Sever Parties (Doc. 68), Motion to Dismiss Indictment (Doc. 71), Motion to Suppress Statements (Doc. 76), and Second Supplemental Motion to Suppress (Doc. 93). (Transcript of Motion to Suppress Hearing, "TM," Doc. 102, pp. 9-12).

2. The vehicle had been rented at the airport in Sarasota, Florida by someone named "Jacole Snyder." Defendant Brooks was listed on the rental agreement as an additional driver. The car was rented through April 29, 2013. (Government's Exhibit 2 to the Hearing of October 1, 2013). It had a Florida license plate. (TM 108).

3. Casey Cope, a corporal with the Lowndes County Sheriff's Office, is assigned to the Interstate Criminal Enforcement Team and is also a K-9 handler. He has some experience with how frequently rental vehicles in Georgia have tinted windows, but he has no training or certification concerning tinted windows in the rental car industry. (TM 12-13, 21, 106-07).

4. Around dusk on April 24, Defendants' vehicle passed Corporal Cope's patrol car as it was parked on the side of Interstate 75. Noticing that the windows in the rental vehicle were tinted and believing that the darkness of the tinting violated Georgia law, Corporal Cope pulled into traffic behind Defendants and signaled for them to pull over. (TM 17).

5. As Corporal Cope drove behind the Defendants, he turned on the video camera mounted on the front dashboard of his patrol car. The camera is equipped with both audio and visual capabilities. The time displayed on the video recording of the traffic stop began from the moment the camera was turned on

and started from 00:00.[2] (TM 17-19; the video recording is Government's Exhibit 1 to the Hearing of October 1, 2013).

6. The audio recording is of poor quality in places because passing traffic and wind created noise interference. Both Cope and Defendants asked for statements to be repeated during the traffic stop because of the difficulty in hearing. (Ex. 1 at 04:48, 05:08, 05:58, 07:44, 09:00, 09:24, 10:20). Furthermore, Corporal Cope does not hear well in one ear. (TM 49).

7. After Defendant Koonce stopped Defendants' car on the shoulder of the interstate, Cope parked immediately behind the Defendants. (Ex. 1 at 00:15—00:30). Approaching the passenger side, Cope walked up to the rental vehicle at 01:41 on the video recording. (TM 19-20).

8. Defendant Neri opened the front passenger door for Corporal Cope who stepped beside the door. The officer came within inches of actually sticking his head inside the vehicle, and he shined his flashlight inside the car. (TM 49-50; Ex. 1 at 01:42—01:57).

9. Cope did not see any weapons or anything illegal inside the car, nor did he smell anything suspicious. He noticed that the Defendants were three black males with tattoos. (TM 50, 101).

---

[2] All subsequent references in the Order to a minute and second sequence, such as "02:01," refer to a point in time on the video recording of the traffic stop.

10. At Cope's request, Koonce walked behind his car to the space immediately in front of the patrol car. When Cope explained why he had pulled them over, Koonce said the car had been rented at the airport in Bradenton, Florida by his brother and sister. They were taking his "other brother back home" to Jesup, Georgia after he had been visiting with them in Florida. (Ex. 1 at 01:58—03:48). The driver did not appear to be under the influence of drugs or alcohol. (TM 50-51).

11. Cope patted Koonce down, but he found nothing suspicious. Koonce was told to remain at the rear of the rental vehicle with another police officer who had arrived on the scene while Cope walked up to the rental car from the passenger's side at 04:05. (Ex. 1 at 03:49—04:05).

12. At approximately 03:00—04:00 on the video recording, Corporal Cope was able to determine that the rental car's window tinting was illegal. (TM 55, 91, 94, 100).

13. Under Georgia law, the driver is responsible for having window tinting in compliance with the law and could receive a ticket for any violation. (TM 111).

14. Cope stepped up to the front passenger window and asked Neri to roll the window partially down so the window tinting could be tested. The camera was able to record most of the conversation between Cope and the passengers, but Koonce and the second police officer standing at the rear of the rental car

blocked the camera's view of Cope and the passengers inside the car. Cope's voice is clear on the recording as he interacts with the passengers, but not all of their answers can be deciphered, and it is frequently unclear which passenger is speaking. (Ex. 1 at 04:06—06:45).

15. When Cope stood at the passenger door talking with Neri and Brooks, he did not notice any drugs, weapons, or money inside the vehicle. Neither one of the passengers was acting furtively. (TM 61, 112).

16. In reply to Cope's questioning, the passengers said that they were headed to Jesup, Georgia. One of the passengers said that his girlfriend "Jacole" had rented the car at an airport. When Cope asked which airport, the passenger said Florida and gave the name of a city that cannot be understood from the recording. When Cope asked if the airport was Sarasota, the passenger said yes. (Ex. 1 at 04:28—05:05).

17. One of the passengers told Cope that the Defendants were taking him back to Jesup, Georgia after visiting with them in Florida. When Cope asked if the driver and both passengers were brothers, one of the passengers clarified that only he and the driver were brothers. (Ex. 1 at 05:06—05:36).

18. Cope asked to see the passengers' IDs, and Brooks provided one. Neri did not have an ID, but he gave Cope his full name and date of birth, October 31, 1975. (Ex. 1 at 05:37—06:07; TM 62).

19. When Cope was talking with the passengers, they handed him the rental agreement for the car. (TM 55).

20. After one of the passengers asked Cope why he had stopped them, he explained that the window tinting in the rental car violated Georgia law. The tinting only allowed 10-11% of the sunlight to come into the car, and state law required the tinting to be no darker than 32%. (Ex. 1 at 06:18—06:28; TM 22).

21. Cope wanted to know how long the passengers had been in Florida. Cope did not understand the response and repeated, "how long? A week? A couple of days?" One of the passengers responded, "We been down there a few hours." (Ex. 1 at 06:33—06:45).

22. At 06:50 on the video recording, Cope walked back to his patrol car. Then, at 07:18, Cope returned to the front of his car and handed something to Koonce.[3] Cope continued to look at something in his hand and started questioning Koonce again, wanting to know how long his brother "had been down there." Koonce replied, "Just a couple of days." (Ex. 1 at 06:50—07:30).

23. Koonce explained that both passengers were his brothers, and they were now returning Neri to Jesup because he had to get back to work, although Koonce did not know where he worked. When Cope asked for Neri's name and date of birth, Koonce correctly spelled Neri's name and indicated his birthday

---

[3] The record is not clear on what Cope handed Koonce. (TM 65).

was in October, although he could not remember the exact date. Koonce said that "me and him are about the same age" and explained that they were brothers but with different fathers. (Ex. 1 at 07:31—09:15).

24. At 09:20 on the video recording, Cope started explaining to Koonce that, because he was not listed as a driver on the rental agreement for the car, under the contract terms he should not be driving. Cope then inquired into Koonce's driving record. Koonce said his driver's license had only been suspended for failure to pay child support. At 10:40 Cope walked to his patrol car to check the history on Koonce's license. (Ex. 1 at 09:20—10:40).

25. Waiting for the results, Cope described to the second police officer what he found suspicious about the situation. While Koonce said both passengers were his brothers and Neri had been in Florida for a couple of days, the passengers had claimed only Neri was Koonce's brother and he had only been in Florida for a few hours. It was also strange that one of the passengers said he came from "back there" or "over there." (Ex. 1 at 11:40—13:35).

26. The second officer said he had talked with the passengers while Cope started running the license check: "I went back up there and asked the brother where he worked, and he said 'I ain't got a job.'" (Ex. 1 at 13:35—13:50).

27. The computer check showed Koonce had a clear driver's license. Cope also called in a request to confirm Neri's identification based on his name,

physical description, and date of birth. Neri's identification was confirmed, and Cope learned there were no outstanding warrants for Neri. (Ex. 1 at 14:00—15:18; TM 76-77, 89).

28. At approximately 15:25 on the video recording, Cope walked back to Koonce and handed him something. While looking at something he kept in his hand, Cope said he was only going to give Koonce a warning for the tinting violation. Cope then continued questioning Koonce about how long Neri had been in Florida and where Neri was from originally. (Ex. 1 at 15:25—16:35).

29. Approximately fifteen minutes after Defendants were pulled over, the original purpose for the traffic stop had concluded. Cope had warned Koonce and returned all of the paperwork, including the driver's license and rental agreement. (TM 77-78).

30. At 16:40 Cope briefly went to his patrol car. He then returned to Koonce and handed something to the driver. He asked if there was anything illegal in the car and listed guns, large amounts of currency, and various narcotics. Koonce said no. Cope requested permission to search the rental car, but Koonce said Cope would have to ask Brooks since his name was on the rental agreement. (Ex. 1 at 16:40—17:50).

31. At 17:57 Cope asked Brooks to step to the rear of the rental car and went through a similar routine with him. Brooks denied there was anything illegal in the

car and asked why Cope needed to search it. After Cope explained the discrepancies in the Defendants' statements, Brooks declined permission to search the car. (Ex. 1 at 17:57—20:40; TM 38-39).

32. After retrieving his drug dog Nitro from his patrol car, Cope began a free air sniff of Defendants' vehicle at 22:00. Because Koonce and Brooks had been told to stand in front of the patrol car, the camera's view of Nitro is blocked during the sniff. After Cope returned Nitro to the patrol car, he informed Koonce and Brooks that Nitro had made a positive alert for drugs in the rental vehicle and that he now had probable cause to search it (Ex. 1 at 21:00—24:00).

33. Cope has used Nitro for drug searches since early 2007. Nitro is certified as a K-9 by a number of national organizations and receives regular training. (TM 42-44).

34. The Defendants were never free to leave at any point before Nitro began his free air sniff at approximately the 22:00 mark. (TM 90-91).

35. A search of Defendants' vehicle revealed a stash of stolen IRS checks in the trunk. (TM 41).

## II.   Findings of Law

Each Defendant has filed a motion to suppress the evidence of the stolen checks obtained as a consequence of the traffic stop. The Defendants do not deny there was probable cause for making the initial stop, but they argue the

stop was unconstitutionally prolonged before the checks were discovered, tainting the evidence as "fruit of the poisonous tree." They also argue there was no probable cause for the search of their car because Nitro did not perform a reliable free-air sniff.[4]

The Fourth Amendment to the United States Constitution guarantees the right for an individual to be free from unreasonable searches and seizures. U.S. CONST. amend. IV; United States v. Ramirez, 476 F.3d 1231, 1236 (11th Cir. 2007). A seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003). Traffic stops are a limited form of seizure under the Fourth Amendment and are subject to the standard imposed by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Ramirez, 476 F.3d at 1236. The Terry standard requires that "an officer's investigation of a traffic stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting Terry, 392 U.S. at 20). Likewise the duration of the traffic stop "must be

---

[4] In his post-hearing brief, for the first time Defendant Brooks also raises a vague argument for suppressing the evidence centered on his contention that no drugs were actually discovered in Defendants' car. This argument is untimely. Brooks' attorney did not question Cope at the evidentiary hearing about whether drugs were found in the car, and the Government has had no opportunity to respond to the argument. If Brooks wished to argue this point, he should have done so earlier.

limited to the time necessary to effectuate the purpose of the stop." United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001).

In general, a traffic stop "must last no longer than is necessary to effectuate the purpose of the stop." United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999); *see also* Ramirez, 476 F.3d at 1237. An officer may lengthen the traffic stop for questioning beyond the initial purpose for the stop in only two circumstances. Pruitt, 174 F.3d at 1220. "First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." Id.; *see also* Ramirez, 476 F.3d at 1237; Boyce, 351 F.3d at 1106. Second, an officer may detain the occupants of a vehicle for questioning beyond the original purpose for the stop if the detention has transformed into a consensual encounter. Id. Only the first exception is of concern here, for the Government does not argue, and the facts do not support, that Defendants consented to further questioning after the window tinting violation had been processed.

Discrepancies in the statements from a vehicle's occupants at a traffic stop may cause a police officer to reasonably suspect that further illegal activity is occurring. *See, e.g.*, United States v. Hernandez, 418 F.3d 1206, 1211 (11th Cir. 2005); United States v. Sanchez, 408 F. Supp. 2d 1255, 1261 (citing conflicting statements from the vehicle's occupants about their destination). In such a

situation, the officer has a duty to investigate further in order to confirm or dispel his concerns. United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) (quoting United States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)). For example, the police officer in Hernandez properly detained the vehicle's occupants in part because they gave inconsistent statements about the length and purpose for their trip. 418 F.3d at 1211. Similarly, in United States v. Ubaldo-Viezca, the driver and passenger gave conflicting stories about their destination and how they planned to pay for the cars they were going to purchase at a car auction. 398 F. App'x 573, 581 (11th Cir. 2010) (per curiam). Additionally, the driver could not state the name of the passenger although she claimed he was her boyfriend and business partner. Id. A police officer would also have cause to be suspicious of a driver and passenger if, among other circumstances, they gave different names for the person who had rented their vehicle. United States v. Banshee, 91 F.3d 99, 100-02 (11th Cir. 1996).

The Court finds that Corporal Cope had objectively reasonable grounds for continuing the traffic stop beyond the time it took to process the tinting violation. While testifying at the evidentiary hearing, Cope related how, in his experience as a police officer for many years in Georgia, rental cars with tinted windows

were frequently associated with criminal activity.[5] The fact that Jacole Snyder had rented Defendants' car but had not accompanied them also raised his suspicions. More significantly still, within the first few minutes of the traffic stop the Defendants gave conflicting answers about who had rented the car, whether they were returning Neri to Jesup for his job,[6] how long they had been in Florida, and how they were related to one another. As in Banshee, Hernandez, and Ubaldo-Viezca, such conflicting statements from Defendants about their trip and the other people in the car were sufficiently indicative of wrongdoing for Cope to detain Defendants beyond the minimum time it might have taken to process the window tinting violation. Cope had a duty to either confirm or dispel his suspicions created by Defendants' inconsistent stories.

Based on a totality of the circumstances, Cope's detention of the Defendants was reasonable and did not constitute an unlawful search and seizure. In reviewing the traffic stop, the Court recognizes that it must be careful to avoid "unrealistic second-guessing" that finds a Fourth Amendment violation merely because it could "imagine some alternative means by which the

---

[5] The Court found Corporal Cope's testimony at the evidentiary hearing to be credible. Where possible, however, the Court relied on its review of the video recording of the traffic stop for an understanding of what transpired on April 24.

[6] Although Neri was speaking to the assisting police officer, not Cope, when he denied having a job, the Court may still take notice of this fact, for "[r]easonable suspicion is determined from the collective knowledge of all of the officers involved in the stop." United States v. Harrelson, 465 F. App'x 866, 867 (11th Cir. 2012) (citing United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989)).

objectives of the police might have been accomplished." Sharpe, 470 U.S. at 686-87. Cope was not required to process the window tinting violation at the fastest possible speed. See id. at 685-87; Hernandez, 418 F.3d at 1212 n. 7. Defendants were not unlawfully detained while Cope reviewed the rental agreement for their car, confirmed their identities, and checked the history on Koonce's license, and while he took these steps he was allowed to ask questions unrelated to the tinting violation. Id.; Ubaldo-Viezca, 398 F. App'x at 581; Boyce, 351 F.3d at 1106. Approximately twenty-one minutes passed from the time Cope first approached Defendants' vehicle until Nitro gave a positive alert for narcotics, and much longer detentions in this circuit have been found to be constitutional. See e.g., United States v. Gil, 204 F.3d 1347 (11th Cir. 2000) (seventy-five minutes); United States v. Cooper, 873 F.2d 269 (11th Cir. 1989) (thirty-five minutes); United States v. Hardy, 855 F.2d 753 (11th Cir. 1988) (fifty minutes). Considering that Cope initially stopped Defendants for an apparent violation of the tinting law, the length of their detention seems *de minimis* at worst and does not seriously implicate Fourth Amendment concerns. See Hernandez, 418 F.3d at 1212 n. 7.

Defendants' contention that the positive alert by the K-9 Nitro during the free-air sniff did not provide probable cause to search their car is without merit. Through Cope's testimony at the hearing and the certificates submitted as

exhibits, the Government has sufficiently established that Nitro's training and experience qualified him as a K-9 to perform a free-air sniff of Defendants' car. A positive K-9 alert provides probable cause for the police to search a vehicle. United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998). Therefore, based on Nitro's alert, Cope had probable cause to search Defendants' vehicle.

### III. Conclusion

For the foregoing reasons, Defendants' Motions to Suppress (Docs. 67, 72, 74, 84, 92, 95, 103, 105) are denied. Defendants' other evidentiary motions (Docs. 68, 71, 76, 77, 78, 85, 93) have been withdrawn.

**SO ORDERED**, this the 31st day of October, 2013.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

scr